*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

DENNIS GIFFORD and MARY GIFFORD,

        Plaintiffs-Appellants,

v

LEONARD J. RADECKI, ASHLEY D. RADECKI, ASHLEY SCHAEFER, and HELLO HOMES GR, LLC,

        Defendants-Appellees.

UNPUBLISHED
May 26, 2022

No. 356394
Kent Circuit Court
LC No. 20-006127-NZ

Before: GLEICHER, C.J., and RONAYNE KRAUSE and BOONSTRA, JJ.

PER CURIAM.

This case involves claims of fraud arising from the sale of a home. Plaintiffs Dennis Gifford and Mary Gifford appeal as of right from an order granting summary disposition under MCR 2.116(C)(10) (no genuine issue of material fact, movant entitled to judgment as a matter of law) in favor of defendants Leonard J. Radecki, Ashley D. Radecki, Ashley Schaefer, and Hello Homes GR, LLC. We affirm.

## I. PERTINENT FACTS AND PROCEEDINGS

The subject property is located in the Heritage Hill neighborhood of Grand Rapids, Michigan. On October 4, 2018, Schaefer and Hello Homes, GR (collectively, "brokers") listed the property for sale on the Multiple Listing Service (MLS), and Schafer posted a marketing video to Facebook. The MLS listing reported that the house was 4,764 finished square feet.[1] The listing

---

[1] As will be discussed later, it appears there is no standardized way to measure or calculate the "finished square footage" of a house, but one way to determine that footage is to rely on "floor area" specified in tax records. The MLS listing indicated that the source of its square-footage figure was "public records," and at the time, the Grand Rapids public records indeed listed the floor area as being 4,764 square feet.

stated that all information was "deemed materially reliable but not guaranteed," and encouraged potential buyers to "verify all information." Similarly, Schaefer stated in the marketing video that the house had "over 4,000 square feet." The Giffords ("buyers") saw the video on October 5, toured the house on October 6, and made a full-price offer on October 7. The Radeckis ("sellers") accepted the offer.

It would turn out that the finished square feet in the MLS listing was incorrect, and the house actually had only 3,138 square feet.[2] Relevant to this matter, buyers alleged that, on October 31, 2018, Schaefer was emailed by Ryan Huizenga, a local real estate attorney who lived in the Heritage Hill neighborhood, as follows:

> Ashley—After the appraisal comes back on 59 Union, can you clean up the square footage on the listing so that it does not screw up future appraisals in Heritage Hill? I have house [sic] that is very similar to this that I will probably be selling next spring, and this would be a fairly good comp except for the square footage measurement on the listing, which is almost 1000 square feet higher than reality. Not your fault at all here—the assessor botched it. They seem to have typed in 43 feet wide instead of 34.[3] Transposed the numbers. That mistake by them means that this house is really "only" about 3800 square feet or so. When the appraisal comes back (if it has not already), it should have the correct measurement on it. If you could get that from the buyer and input it, that would be appreciated. Thanks!

Schafer responded:

> Hi Ryan,
>
> Thanks for reaching out. We do use the municipality numbers and while we felt it was high, we didn't have anything else to go off of. However prior to listing, we had a floor plan done which revealed similar square footage so we felt the numbers were correct. If the buyers are willing to share the appraisal, of course I will adjust. I would never want to misrepresent or provide false information.

On November 7, Huizenga e-mailed Schaefer that the assessor had corrected the records to reflect that the home's square footage was 3,138. No one disclosed the corrected square-footage information to buyers. Buyers conducted an inspection of the house, but the inspection did not include measuring the property. The closing occurred on November 16.

---

[2] As will also be discussed later, we have not been able to discern how this figure was calculated, but it appears that the parties agree—at least for purposes of summary disposition—that 3,138 square feet is the correct measurement.

[3] Attached to the MLS listing was a set of interior floor plans for each floor of the house. The Grand Rapids public records included an exterior plan of the house. In 2018, the exterior plan showed the main part of the house to be 43 feet wide along one of its dimensions and 40 feet along another. In 2019, these measurements were corrected to 35 feet and 36 feet, respectively.

In 2019, when the City officially updated its records, buyers learned that the floor area of the home was only 3,138 square feet. Buyers recounted that their real estate agent contacted Schaefer in May 2019 to ask why the square-footage information was withheld from buyers. Schaefer confirmed in an e-mail that she had been made aware of the difference in square footage the week before closing, but she "didn't know how it was verified or confirmed." She further stated that she "should have made you/your buyers aware that this was brought to the attention of the assessor," and she apologized for having failed to do so.

Buyers alleged that, despite this knowledge and the fact that the representation of square footage was material to the deal, brokers and sellers (collectively, defendants) "intentionally, willfully, wantonly and/or maliciously withheld this information from [buyers] and made no attempt to disclose or otherwise advise [buyers] of the misrepresentation." Buyers asserted that Hello Homes was vicariously liable for damages arising from Schaefer's misrepresentations and that sellers were vicariously liable for damages arising from brokers' "wrongful and/or negligent acts" regarding the sale of the house (Count I); that defendants were liable for fraud (Count II), silent fraud/fraud by nondisclosure (Count III), and negligent misrepresentation (Count V); and that sellers were liable for innocent misrepresentation (Count IV).

Brokers moved for summary disposition under MCR 2.116(C)(7) (dismissal appropriate because of release). Brokers argued that the purpose of the MLS listing was "not to warrant any aspect or information of the property, but merely to provide potential purchasers with sufficient information to determine if they would like to view the property further." Brokers asserted that they properly identified local tax records as the source of information for the square footage of the house and accurately stated in the MLS listing the square footage reported by those records. They observed that the listing stated that the information therein was " 'not guaranteed' and that buyers should 'verify all information.' " Brokers further asserted that summary disposition was warranted because ¶ 15 of the purchase agreement authorized buyers to conduct, or to arrange for, inspections and investigations of the property, after which buyers could either terminate the agreement or accept [the] property 'as-is' and proceed to close . . . "[4] After conducting their own inspections,

---

[4] Paragraph 15 of the purchase agreement provided in relevant part:

> 15. Inspections & Investigations:
>
> Inspections: Buyer, or someone selected by Buyer, has the right to inspect the buildings, premises, components and systems, at Buyer's expense . . .
>
> Investigations: It is the Buyer's responsibility to investigate (i) whether the Property complies with applicable codes and local ordinances and whether the Property is zoned for Buyer's intended use; and (ii) whether Buyer can obtain a homeowner's insurance policy for the Property at a price and terms acceptable to Buyer.
>
> . . . If the results of Buyer's Inspections and Investigations are not acceptable to Buyer, Buyer may . . . by written notice to Seller, either terminate this Agreement and receive a refund of Buyer's good-faith deposit, or make a written proposal to Seller to correct those unsatisfactory conditions. If Buyer fails to make a written

buyers executed a property inspection waiver, which brokers argued contained a valid release of claims against Hello Homes. Finally, brokers contended that buyers agreed in ¶ 24 of the purchase agreement that they were not relying on any statement made by brokers unless it was expressly stated in the agreement, a written addendum to the agreement, or a disclosure statement signed by sellers. Brokers argued that because buyers were bound by the unambiguous terms of the release and the purchase agreement, buyers could not maintain their action against brokers as a matter of law. Sellers submitted a brief in support of brokers' motion for summary disposition, raising essentially the same arguments.

Buyers responded that summary disposition was unwarranted for three reasons. First, the "as-is" clause in ¶ 15 of the purchase agreement applied only to conditions discoverable through a home inspection, and the calculation of a home's square footage was not part of a home inspection. Second, even if the "as-is" clause was relevant, it did not bar buyers' claims because the e-mail exchange between Huizenga and Schaefer and the fact that the content of the exchange was withheld from buyers established that brokers committed precontractual fraud, thereby allowing buyers' claims to go forward. Third, the property inspection waiver did not waive buyers' concerns about the home's square footage because, as already indicated, the calculation of square footage was not part of a home inspection, and because the waiver was "invalid and unenforceable because it was procured by fraud."

Brokers replied that they truthfully and accurately reported the square footage of the house as found in public records; that their representations were true when made; that they remained true through closing and into 2019, when the city of Grand Rapids revised its tax records; and that they were not obligated to inform buyers of the opinion of a stranger to the transaction. Brokers further replied that the notion that they could conceal the square footage of the home was absurd, given that brokers provided all potential buyers of the property "a detailed floor plan with accurate dimensions for every room in the home"; considering buyers' unfettered access to the home before and after they made their offer; and given the due-diligence period during which buyers could thoroughly inspect any aspect of the home and terminate the contract for almost any reason. Lastly, brokers urged the court to reject buyers' implications that there were limits to their inspections and investigations and to find that buyers had an unconditional right to inspect any aspect of the property.

After hearing oral argument on brokers' motion, the trial court entered a written opinion and order. In that order, it acknowledged that brokers moved for summary disposition under MCR 2.116(C)(7), but it observed that the parties' arguments and evidence focused primarily on "the content of the purchase agreement," and on whether there were genuine issues of material fact regarding whether defendants committed actionable fraud. Accordingly, the trial court treated the motion as brought under MCR 2.116(C)(10). The court first determined that "there was never any false statement by the Broker Defendants." Brokers' representations regarding square footage were based on public records, and the representations were accurate when made and remained accurate until after closing. The court concluded that, because of the accuracy of brokers'

---

proposal within the above referenced time period, then Buyer will be deemed to have accepted the Property as-is. . . .

statements, brokers "could not have had a legal duty to alert [buyers] of the potential issues raised by a neighbor."

The trial court next concluded that buyers had not established any legal duty for brokers to disclose Huizenga's concerns about the home's square footage. When the purchase agreement became effective in October 2018, buyers had a right to arrange for any inspections and investigations of the house, including an appraisal and square-footage measurements, and to terminate or renegotiate the agreement as necessary. Buyers arranged for an ordinary home inspection and requested addenda to the purchase agreement on the basis of the home inspection. However, they did not arrange for an appraisal, and "they never expressed any issues with the size of the home, despite having walked through it and having access to accurate room-by-room floor maps that included dimensions."[5] Under these circumstances, buyers had not established any legal duty requiring defendants to report Huizinga's concerns to buyers.

Lastly, the trial court concluded that buyers disclaimed any reliance on prior statements of square footage. The court pointed to ¶ 24 of the purchase agreement, which stated in relevant part:

> Buyer agrees that ***Buyer is not relying on any representation or statement made by Seller or any real estate salesperson (whether intentionally or negligently) regarding any aspect of the Property of this sale transaction***, except as may be expressly set forth in this Agreement, a written amendment to this Agreement, or a disclosure statement separately signed by the Seller.

The trial court reasoned that

> [n]othing in the purchase agreement itself, the addenda, or the Radickis' [sic] seller's disclosure statement said anything about square footage. Accordingly, [buyers'] attempt to now claim reliance on prior statements of square footage (that were not even fraudulent when made) cannot succeed. They already disclaimed reliance, and as a matter of law any continued reliance despite this disclaimer would not be reasonable and could not support any claim for fraud or misrepresentation.

The trial court concluded that buyers' claim failed as a matter of law and that summary disposition of their complaint was warranted. After buyers moved unsuccessfully for reconsideration, this appeal followed.

## II. STANDARDS OF REVIEW

A grant or denial of summary disposition is reviewed de novo on the basis of the entire record to determine if the moving party is entitled to judgment as a matter of law. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). When reviewing a motion under MCR 2.116(C)(10), which tests the factual sufficiency of the complaint, this Court considers all evidence submitted by the parties in the light most favorable to the non-moving party and grants summary disposition only where the evidence fails to establish a genuine issue regarding any material fact.

---

[5] We have scrutinized the floor plans and will discuss our conclusions regarding those plans below.

*Id.* at 120. Summary disposition is appropriate when, "[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." MCR 2.116(C)(10). "The difference between a motion under MCR 2.116(C)(7) and a motion under MCR 2.116(C)(10) is that a movant under MCR 2.116(C)(7) is not required to file supportive material, and the party opposing the motion is not required to respond in kind," and the "contents of the complaint must be accepted as true unless specifically contradicted." *Patterson v Kleiman*, 447 Mich 429, 434 n 6; 526 NW2d 879 (1994). Whether a party has been afforded due process is a question of law that we review de novo. *Al-Maliki v LaGrant*, 286 Mich App 483, 485; 781 NW2d 853 (2009).[6]

## III. DUE PROCESS

Buyers first contend that the trial court violated their procedural due-process rights by granting summary disposition to defendants under MCR 2.116(C)(10) *sua sponte*, without giving buyers an opportunity to submit further briefing, and by denying buyers' motion for reconsideration. We disagree.

When a trial court reviews a motion for summary disposition, "[i]f the pleadings show that a party is entitled to judgment as a matter of law, or if the affidavits or other proofs show that there is no genuine issue of material fact, the court shall render judgment without delay." MCR 2.116(I)(1). Summary disposition under MCR 2.116(I)(1) is appropriate only if basic due-process requirements are also satisfied. See *Lamkin v Hamburg Twp Bd of Trustees*, 318 Mich App 546, 550; 899 NW2d 408 (2017) (explaining that the court rule does not establish an exception to basic due-process requirements). "The basic requirements of due process in a civil case include notice of the proceeding and a meaningful opportunity to be heard." *Al-Maliki*, 286 Mich App at 485.

In *Al-Maliki*, this Court concluded that the trial court had improperly granted the defendant's motion for summary disposition under MCR 2.116(I)(1) because it *sua sponte* considered an *issue* that no party had raised or argued—and in fact, the defendant had expressly conceded in the plaintiff's favor for the purposes of the motion. *Al-Maliki*, 286 Mich App at 484-488. The trial court's actions in this matter are entirely dissimilar: the trial court did not address

---

[6] Strictly speaking, buyers did not technically preserve their due process challenge to the trial court *sua sponte* considering the motion for summary disposition under MCR 2.116(C)(10), because they first raised the issue in a motion for reconsideration. See *Vushaj v Farm Bureau Gen Ins Co of Mich*, 284 Mich App 513, 519; 773 NW2d 758 (2009). However, it appears the trial court did not inform the parties that it was considering the motion under MCR 2.116(C)(10) until it actually entered its written opinion and order. Buyers therefore could not have challenged the trial court's decision to do so any earlier than in their motion for reconsideration. "The purpose of the appellate preservation requirements is to induce litigants to do what they can in the trial court to prevent error and eliminate its prejudice, or to create a record of the error and its prejudice." *People v Mayfield*, 221 Mich App 656, 660; 562 NW2d 272 (1997). Issue preservation requirements have never obligated parties to perform impossibilities. *Lee v Marsh*, 19 Mich 11, 12-13 (1869). We therefore find it appropriate to overlook the issue preservation requirements in this matter. See *Steward v Panek*, 251 Mich App 546, 554; 652 NW2d 232 (2002).

any issue not raised and argued by the parties, but rather decided to treat those issues as they had been argued rather than as they had been framed. "A trial court is not bound by what litigants choose to label their motions because this would exalt form over substance." *Lieberman v Orr*, 319 Mich App 68, 77 n 4; 900 NW2d 130 (2017) (quotation marks and citation omitted). "Rather, courts must consider the gravamen of the complaint or motion based on a reading of the document as a whole." *Id*. It is well-established that appellate courts review grants or denials of summary disposition under the substantively correct rule, irrespective of the rule identified by the trial court. *Spiek v Dep't of Transportation*, 456 Mich 331, 338 n 9; 572 NW2d 201 (1998). Likewise, when a party "brings a summary disposition motion under the wrong subrule, the trial court may proceed under the appropriate subrule as long as neither party is misled." *Blair v Checker Cab Co*, 219 Mich App 667, 670-671; 558 NW2d 439 (1996). It does not automatically constitute a due process violation for the trial court to have considered the motion under MCR 2.116(C)(10) instead of the court rule formally cited by the parties.

It was not strictly "wrong" for brokers to state that their motion was brought under MCR 2.116(C)(7), because they did argue that the property inspection waiver released brokers from buyers' claims. However, it was incomplete, because brokers' motion went beyond that argument and also asserted that certain provisions of the purchase agreement specifically barred buyers' claims. Furthermore, buyers responded to arguments arising from the purchase agreement, including submitting an affidavit from their home inspector to support their argument. Buyers therefore do not appear to have been misled as to the substance of brokers' arguments and understood that brokers were arguing for summary disposition on grounds other than release.

Buyers imply that the trial court's summary disposition decision was influenced by new arguments "akin to those raised in a (C)(10) motion" that sellers raised in their untimely brief, to which buyers did not have an opportunity to respond. However, sellers' brief did not advance new arguments. Rather, it responded to arguments already made by buyers in their brief in opposition to summary disposition. Specifically, sellers expressed skepticism about buyers' statement (and supporting affidavit) that the size of the house was "a material factor" in their decision to make a full-price offer. Sellers also observed that buyers had not supported with evidence their assertion that their signature on the property inspection waiver was procured through fraud. Buyers' insinuation that the trial court's decision to view brokers' summary disposition under MCR 2.116(C)(10) arose from anything other than the court's analysis of brokers' and buyers' summary disposition arguments is not supported by the record.

We recognize that treating a motion under MCR 2.116(C)(7) as a motion under MCR 2.116(C)(10) could be erroneous to the extent a trial court imposes upon the non-moving party an obligation to respond to the motion with documentary evidence. See *Patterson*, 447 Mich at 434 n 6. Recasting the nature of a motion for summary disposition therefore has the potential to deprive a party of due process. However, any such error was harmless here, because buyers did actually respond to the motion with evidence, and moreover responded to the motion with arguments that required an analysis of the evidence very much akin to a motion under MCR 2.116(C)(10). A release that was not fairly and knowingly entered into, such as being due to fraudulent conduct, is invalid. *Paterek v 6600 Ltd*, 186 Mich App 445, 449; 465 NW2d 342 (1990). Procurement by

fraud and a challenge to the scope of a release are both defenses to a release.[7] See *Collucci v Elkund*, 240 Mich App 654, 659; 613 NW2d 402 (2000). The mere fact of the release cannot be dispositive under the circumstances.

In any event, buyers had a meaningful opportunity to be heard on the substantive issues that formed the basis of the trial court's decision. See *Al-Maliki*, 286 Mich App at 485. Although buyers may have been surprised by the trial court's recitation of MCR 2.116(C)(10) as the subrule under which it granted summary disposition, they could not reasonably have been surprised by the substance of trial court's decision and reasoning, because the court based its decision on arguments made by brokers and buyers in their respective summary disposition briefs. The basis of the trial court's decision was its findings and legal conclusions that: (1) brokers never made a false statement and were not obligated to convey Huizenga's information to buyers; (2) buyers had the right to arrange for inspections and investigations of the house and to terminate or renegotiate the purchase agreement, but expressed no particular interests in or concerns about the home's square footage; and (3) buyers agreed that they were not relying on any statements or representations other than those expressly stated in the purchase agreement, a written amendment to the purchase agreement, or the sellers' signed disclosure statement, none of which said anything about the home's square footage. Brokers and buyers addressed each of these issues in their briefs, and buyers do not identify any specific issue upon which they had *not* been heard.

Brokers argued in their brief in support of summary disposition that the statements they made were not false and that buyers' signature on the purchase agreement and property inspection waiver bound buyers to the terms of those documents. Specifically, brokers contended that buyers accepted the property "as-is," disclaimed any reliance on prior statements about the home's size, and released brokers from any liability arising from inspections authorized under the purchase agreement, whether completed or not. Buyers responded that brokers had misconstrued the "as-is" provision in the purchase agreement and that, even if brokers' interpretation was correct, buyers' claims were not barred because, as the e-mail exchange between Schaefer and Huizenga establishes, Schaefer committed fraud to induce buyers to sign the purchase agreement and the property inspection waiver. Buyers argued on the basis of Dennis Gifford's affidavit that the size of the house was a material factor in buyers' decision to make a full-price offer and that Schaefer had a responsibility under the National Association of Realtors' Code of Ethics and Standards of Practice to reveal the content of the e-mails to buyers. The trial court based its decision on arguments and issues raised by brokers and buyers in their respective summary disposition briefing. Cf. *Al-Maliki*, 286 Mich App at 489. Buyers cannot reasonably argue that they did not have a meaningful opportunity to be heard. Finally, we note that the trial court gave proper consideration to buyers' motion for reconsideration, in which buyers thoroughly briefed their argument that there remained outstanding questions of material fact. See *id*. at 486.

The trial court did not violate buyers' due-process rights by granting summary disposition in favor of brokers under MCR 2.116(C)(10). The trial court properly considered the gravamen

---

[7] Although such defenses would ordinarily require the party challenging the release to tender back any consideration received for the release, the evidence here suggests that no individual consideration was given for the release, rendering the tender-back obligation irrelevant.

of the parties' summary disposition arguments and analyzed brokers' motion for summary disposition under MCR 2.116(C)(10); and buyers had a meaning opportunity to be heard, and were heard, on the issues that formed the basis of the trial court's summary disposition decision.

## IV. QUESTION OF MATERIAL FACT

Buyers next contend that the trial court erred by granting summary disposition under MCR 2.116(C)(10) in favor of defendants because there remained questions of fact regarding whether defendants defrauded buyers, discovery had not concluded, and a fair likelihood existed that further discovery would yield support for buyers' position. Again, we disagree.

Buyers alleged that brokers committed fraud, silent fraud, and negligent misrepresentation. To prove actionable fraud, a plaintiff must establish the following:

> (1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew that it was false, or made it recklessly, without knowledge of its truth as a positive assertion; (4) the defendant made the representation with the intention that the plaintiff would act upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered damage. [*M&D, Inc v WB McConkey*, 231 Mich App 22, 27; 585 NW2d 33, 36 (1998).]

There is no doubt that defendant made a material representation, clearly satisfying the first element. Whether the representation was "false" is open to some interpretation: it is apparently undisputed that the figure of 4,764 square feet was factually incorrect, but also that it faithfully reflected what was in the public records cited by the MLS listing as its source. For purposes of summary disposition, we presume there is at least a question of fact whether the representation was "false," satisfying the second element.

However, there is no evidence in the record that brokers or sellers *knew* the figure of 4,764 square feet was false, or that the representation was made recklessly, and buyers only cite the vague possibility that such evidence might exist. There is apparently no consistent way to measure square footage, and no reason is apparent to us why it was unreasonable to rely on public tax records. Furthermore, we measured the 2018 exterior plan of the house: depending on some assumptions about an irregularly-shaped portion of the plan, it reflects a square footage between 4,536 and 4,754 square feet, which is plausibly close to the listed figure of 4,764 square feet. We have also scrutinized the interior floor-plans for the individual floors of the house, and including both the basement and the attic, they come to a total of 4,396 square feet.[8] Schafer's email to Huizenga reflects some doubt about the accuracy of the figure of 4,764, but also that Schafer had consulted the floor plans and found a reasonable degree of congruence, which we find plausible.

---

[8] If either the attic or the basement is omitted from the total square footage, the result is either 3,085 or 3,137 square feet, which is also fairly close to the "true" square footage. Our efforts to independently research the issue revealed that the inclusion of attics and basements in houses' finished square footage is inconsistent and dependent upon various factors specific to individual houses.

Buyers merely speculate that perhaps defendants were aware of some other information. Even if discovery is not yet complete, a party opposing summary disposition must provide more than such speculation. *Caron v Cranbrook Ed Community*, 298 Mich App 629, 645-646; 828 NW2d 99 (2012).

We conclude that there is no evidence to support the contention that defendants knew the figure of 4,764 square feet was inaccurate when the MLS listing was made, or that they recklessly asserted that the house had a finished square footage of 4,764 square feet. At most, brokers had some suspicions that were reasonably allayed by the information available to them at the time. Buyers offer nothing but speculation to the contrary, which "cannot create a question of fact." *Estate of Trueblood v P&G Apartments, LLC*, 327 Mich App 275, 289; 933 NW2d 732 (2019). Buyers' fraud claim was properly dismissed.[9]

Buyers further contend that even if brokers' representations about the house's size were not false when they were made, brokers "had a clear obligation and a legal duty" to disclose to buyers that the house had been remeasured at 3,138 square feet, information brokers received from Huizenga nine days before closing. Regardless of whether brokers had an ethical obligation to disclose the erroneous measurement and its correction, as Schaefer's apology suggests, we are unable to conclude that brokers had a legal obligation under the circumstances.

"Silent fraud is essentially the same [as common-law fraud] except that is based on a defendant suppressing a material fact that he or she was legally obligated to disclose, rather than making an affirmative misrepresentation." *Alfieri v Bertorelli*, 295 Mich App 189, 193; 813 NW2d 772 (2012). "A claim for negligent misrepresentation requires plaintiff to prove that a party justifiably relied to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care." *Id.* at 194. "Silent fraud and negligent misrepresentation both require a defendant to owe a duty to the plaintiff." *Id.* Although sellers' agents generally have no "duty per se of disclosure to buyers,"

> a duty of disclosure may be imposed on a seller's agent to disclose newly acquired information that is recognized by the agent as rendering a prior affirmative statement untrue or misleading. This is especially true when the agent knows that the buyer has a particular concern with the subject matter of that statement. [*Id.* (citations omitted).]

In *US Fidelity & Guaranty Co v Black*, 412 Mich 99; 313 NW2d 77 (1981), the defendants were entitled to assert a defense of silent fraud, because the parties had explicitly discussed defendants' reliance upon certain representations made by the plaintiff, so the plaintiff was obligated to disclose to defendants their subsequent discovery that those representations had been inaccurate.

---

[9] We also find ourselves somewhat skeptical of buyers' reliance on the MLS listing's statement of the house's square footage, given that buyers had floor plans with apparently accurate measurements of each room in the house, had walked through the house, and had ample opportunity to explore whether its interior space was actually sufficient for their needs. Nevertheless, buyers did represent in an affidavit that they also relied on the house's relatively low price per square foot, compared to nearby comparable houses.

*Id.* at 107-113, 126-127. In *Alfieri*, this Court found a question of fact whether the defendant sellers' agents had an affirmative duty to disclose to plaintiff buyers that a sales brochure had inaccurately reported the property to be decontaminated, because the plaintiffs expressly asked the defendants about the condition of the property, and the Department of Environmental Quality had explicitly told the defendants that the brochure was wrong. *Alfieri*, 295 Mich App at 194.

In contrast, there is no evidence here that buyers ever made any specific inquiries to brokers or sellers regarding the house's square footage. Although buyer Dennis Gifford stated in an affidavit that the finished square footage of the house was a material factor in buyers' decision to purchase the house, and if defendants had disclosed that the house had only 3,138 square feet, buyers would not have purchased the house for the advertised price, he did not attest that Schaefer was aware of the factors important to buyers' decision. Furthermore, the MLS listing provided the source of the square footage information and advised potential buyers to verify all information, and although the exterior plan of the house was apparently incorrect, buyers had interior floor-plans that *were* correct and a full opportunity to inspect and explore the property. Buyers were also apparently represented by a real estate agent. Therefore, brokers had no reason to suspect that buyers had not satisfied any questions critical to their decision to purchase the house. Furthermore, the information Schaefer received that the square footage was incorrect did not come from an official source, but rather from a local private individual who wanted the information corrected for his own personal benefit—and as such, Schaefer had no reason to trust that information implicitly. Indeed, Huizenga's correction was not officially made until 2019, and we note that according to the 2019 exterior plan attached to the complaint, Huizenga's alternative measurement was not entirely correct, either.[10]

Under the circumstances, regardless of whether Schaefer should ethically have passed on to buyers that the square footage figure in the MLS listing might not be correct, we are unable to conclude that she had a legal obligation to do so. Absent a duty to disclose, buyers' claims of silent fraud and negligent misrepresentation must fail. Buyers' claims of fraud, silent fraud, and negligent misrepresentation, having failed, so too must their claims of vicarious liability against Hello Homes, GR, and sellers. Buyers do not challenge on appeal the trial court's dismissal of their claim against sellers for innocent misrepresentation.

Affirmed.

/s/ Elizabeth L. Gleicher
/s/ Amy Ronayne Krause
/s/ Mark T. Boonstra

---

[10] See footnote 3.